488 P.3d 1150
In Re The PEOPLE of the State of Colorado, Plaintiff,
v. Delbert Ray VIGIL, Defendant.
Supreme Court Case No. 20SA240 Supreme Court of Colorado.
June 14, 2021
Attorneys for Plaintiff: John Kellner, District Attorney, Eighteenth Judicial District, Susan J. Trout, Senior Deputy District Attorney Centennial, Colorado
Attorneys for Defendant: Megan A. Ring, Public Defender, Christian Enrique Izaguirre, Deputy Public Defender, Andrew P. Castle, Deputy Public Defender Centennial, Colorado
Attorneys for Respondent Arapahoe County District Court: Philip J. Weiser, Attorney General, Emily B. Buckley, Assistant Attorney General Denver, Colorado
En Banc
CHIEF JUSTICE BOATRIGHT delivered the Opinion of the Court.
¶1 A conviction for first-degree assault under section 18-3-202(1)(a), C.R.S. (2020), requires proof that the defendant caused "serious bodily injury" to another person using a deadly weapon. The Criminal Code defines "[s]erious bodily injury" as "bodily injury which, either at the time of the actual injury or at a later time, involves substantial risk of death." § 18-1-901(3)(p), C.R.S. (2020). This case concerns the meaning of the phrase "substantial risk of death" in the definition of serious bodily injury.
¶2 Here, Delbert Vigil allegedly stabbed Ryan Combs in the neck. The knife missed all vital structures, and Combs needed only stitches for treatment. The People and Vigil disagree on whether the injury involved substantial risk of death and, therefore, whether Vigil caused serious bodily injury. The People argue that the injury involved substantial risk of death because Vigil swung a knife at Combs and inflicted an injury to Combs's neck—a part of the body crucial for sustaining life. In response, Vigil argues that the injury did not involve substantial risk of death because the knife did not damage any of the vital structures in Combs's neck. Thus, the People and Vigil disagree on whether the risk generally associated with the type of conduct or injury in question—here, a stab wound to the neck—or the facts of the actual injury control the substantial risk of death determination.
¶3 The trial court, at a preliminary hearing, found probable cause for serious bodily injury, reasoning that "[i]t's not the damage that was actually done here, [but] the injury itself" that controls the substantial risk of death determination. The court, in other words, sided with the People and relied on the conduct and risk generally associated with the type of injury in question. Vigil filed a C.A.R. 21 petition, and we issued a rule to show cause to consider the meaning of "substantial risk of death" in the definition of serious bodily injury.
¶4 We now hold that the facts of the actual injury control the substantial risk of death determination under section 18-1-901(3)(p), not the risk generally associated with the type of conduct or injury in question. In doing so, we reaffirm our decision in Stroup v. People, 656 P.2d 680 (Colo. 1982), and to the extent inconsistent with Stroup and this opinion, overrule the court of appeals' decisions in People v. Sanchez, 751 P.2d 1013 (Colo. App. 1988), and People v. Covington, 988 P.2d 657 (Colo. App. 1999), rev'd on other grounds, 19 P.3d 15 (Colo. 2001). Accordingly, because the knife missed all vital structures, the stab wound to the neck here did not involve substantial risk of death, and thus, Vigil did not cause serious bodily injury. Therefore, we make the rule to show cause absolute and remand for further proceedings consistent with this opinion.
I. Facts and Procedural History
¶5 A riverside smoke break devolved into a drunken and bloody knife fight, during which Combs sustained two stab wounds, one to the left side of his neck and the other to back of his left arm.
¶6 Fortunately, Combs escaped the worst. According to Dr. Erik Verzemnieks, the emergency room physician who treated Combs after an ambulance delivered him to the hospital, a stab wound to the neck would involve substantial risk of death if it "injured any of [the relevant] vital structures," including "the major blood vessels, the lungs, potentially the esophagus, trachea, and the spinal cord." Therefore, based on the manner in which Combs sustained the stab wound to the neck and its location, Dr. Verzemnieks and the hospital's trauma team initially "felt there was a potential for a high enough risk of injury to those structures that [they] could not rule it out any other way until getting [a] CT scan." The medical examination, including the CT scan and an evaluation by a surgeon, however, revealed no damage to the vital structures. After a two-hour stay, during which the "only treatment [Combs] received for those wounds" consisted of stitches, Combs left the hospital with a letter from Dr. Verzemnieks describing "superficial" and "minor" injuries. Later, Dr. Verzemnieks indicated on an "SBI form" that the stab wound to the neck did not constitute serious bodily injury.
¶7 After Combs identified Vigil as the assailant, the People charged Vigil with four counts, including, as relevant here, Count 2, attempted first-degree assault under sections 18-3-202(1)(a) and 18-2-101, C.R.S. (2020), a class 4 felony. After a preliminary hearing and Vigil's entry of a not guilty plea, the People moved to amend Count 2 from attempted first-degree assault to completed first-degree assault, causing serious bodily injury with a deadly weapon, under section 18-3-202(1)(a), a class 3 felony. The motion entitled Vigil to a preliminary hearing on that count, which he requested.
¶8 At that preliminary hearing, the trial court addressed the sole issue of serious bodily injury, specifically whether probable cause existed to find that Combs's stab wound to the neck involved substantial risk of death. The People first called Investigator Michael Buoniconti, who testified that in speaking with Dr. Verzemnieks about the SBI form, the doctor explained that his conclusion that Combs's stab wound to the neck did not constitute serious bodily injury "was based on after his treatment was completed, not based on the time of the injury." According to Investigator Buoniconti, Dr. Verzemnieks further explained that "had he ... understood that form, as he does now, that he would have signed off on [serious bodily injury] then." The prosecutor asked Investigator Buoniconti to clarify the reasoning behind Dr. Verzemnieks's change of heart, specifically whether "at the time of the injury, when [Combs] was stabbed in the neck, [Dr. Verzemnieks] believed there was a substantial risk of death, based on the vital areas that could be damaged there," and Investigator Buoniconti responded in the affirmative. (Emphasis added.)
¶9 Vigil then called Dr. Verzemnieks. After asking Dr. Verzemnieks about Combs's injuries and treatment, defense counsel drew a distinction between "risk of conduct" and "risk created by actual injury"1 :
Q. So, Doctor, you talked a moment ago about [how] a laceration or a stab wound to the neck could create certain risks with respect to blood vessels, lungs, esophagus, and other critical components of the body; correct?
A. Correct.
Q. And that conduct could create a substantial risk of death; right?
A. Absolutely.
Q. Okay. Now, that is the conduct. Now I want to talk about Mr. Combs and the actual injury that occurred here.
(Emphases added.) Then, defense counsel confirmed with Dr. Verzemnieks that Combs had not, in fact, sustained damage to the esophagus, lungs, spine, or blood vessels. To conclude, defense counsel asked whether, "based on everything, the actual injuries ... in your professional medical opinion did not create substantial risk of death," and Dr. Verzemnieks agreed that the actual injuries did not create such a risk.
¶10 The prosecutor's cross-examination of Dr. Verzemnieks pursued the conduct/actual injury distinction, and the following exchange ensued:
Q. And would it be your opinion that at the time of the actual injury sustained by the victim, that the injury caused substantial risk of death?
A. At the time of the injury[,] knowing nothing else?
Q. Right.
A. I would say so.
Q. And is that based on the organs you described and the manner of the injury that you learned about, as part of your treatment, a stab to the neck?
A. Correct.
(Emphasis added.)
¶11 The trial court found probable cause for serious bodily injury. The court addressed the conduct/actual injury distinction and relied on Stroup as well as Sanchez and Covington —two court of appeals decisions interpreting Stroup —in its analysis, reasoning that "the definition of serious bodily injury speaks in terms of injury not damage." Therefore, the court concluded, "it's not the damage that was actually done here" that mattered but "the injury itself, at the time the knife enters Mr. Combs' neck." Because "that's exactly what Dr. Verzemnieks testified to, that at that time he would find that there was a risk, a substantial risk of death," the court bound over the amended Count 2 for trial.
¶12 Vigil filed a C.A.R. 21 petition, and we issued a rule to show cause. We now explain our decision to exercise original jurisdiction.
II. Original Jurisdiction ¶13 We exercise original jurisdiction and grant relief under C.A.R. 21 only when "no other adequate remedy ... is available." C.A.R. 21(a)(1). We deem such relief appropriate, for example, "when an appellate remedy would be inadequate, when a party may otherwise suffer irreparable harm, [or] when a petition raises issues of significant public importance that we have not yet considered." People v. Huckabay, 2020 CO 42, ¶ 9, 463 P.3d 283, 285 (alteration in original) (quoting People v. Kilgore, 2020 CO 6, ¶ 8, 455 P.3d 746, 748 ). Indeed, C.A.R. 21 provides relief "extraordinary in nature" and "wholly within [this court's] discretion." C.A.R. 21(a)(1).
¶14 In granting the petition, we concluded that the issue in this case—namely, whether serious bodily injury can be created only through the defendant's conduct rather than the facts of the victim's actual injury—constitutes a question of significant public importance. In addition, we concluded that an appellate remedy would be inadequate: If Combs's stab wound to the neck involved substantial risk of death, Vigil will face more serious charges. That may impact trial strategy and, potentially, decisions surrounding plea negotiations.
¶15 We now consider the petition on its merits.
III. Analysis
¶16 We first determine that a de novo standard of review applies. Then, we review the applicable statutes, our decision in Stroup , the court of appeals' decisions in Sanchez and Covington , and the General Assembly's intervening amendment of the serious bodily injury definition. We ultimately reaffirm our decision in Stroup and hold that the facts of the actual injury control the substantial risk of death determination under section 18-1-901(3)(p), not the risk generally associated with the type of conduct or injury in question. In doing so, we determine that Sanchez and Covington erroneously interpret our decision in Stroup and—to the extent inconsistent with Stroup and this opinion—overrule them. Finally, applying the correct standard to the facts of this case, we conclude that because the knife missed all vital structures, the stab wound to the neck here did not involve substantial risk of death, and thus, Vigil did not cause serious bodily injury. Therefore, we make the rule to show cause absolute and remand for further proceedings consistent with this opinion.
A. De Novo Standard of Review ¶17 Whether a court applied the correct legal standard presents a question of law that we review de novo. In re Marriage of Durie, 2020 CO 7, ¶ 13, 456 P.3d 463, 468 (citing Kutzly v. People, 2019 CO 55, ¶ 8, 442 P.3d 838, 841 ).
B. Serious Bodily Injury, Substantial Risk of Death, and Stroup
¶18 A person commits the crime of first-degree assault in various ways, including when, "[w]ith intent to cause serious bodily injury to another person, he causes serious bodily injury to any person by means of a deadly weapon." § 18-3-202(1)(a) (emphasis added).2 The Criminal Code defines "[s]erious bodily injury" as "bodily injury which , either at the time of the actual injury or at a later time, involves a substantial risk of death" (or several other risks and consequences not relevant here). § 18-1-901(3)(p) (emphases added).
¶19 We analyzed a prior version of the serious bodily injury definition3 in Stroup and concluded that the plain language of the definition "focuses on the injury the victim actually suffered rather than the risk to the victim posed by the defendant's conduct." 656 P.2d at 685. In Stroup, the trial court allowed the People's medical expert to testify that a stab wound to the victim's forehead created a substantial risk of death because "the knife would have penetrated the brain had the point of entry been a fraction of an inch to the right or left." Id. at 686 (emphasis added). But the knife did not actually penetrate the brain. Thus, the expert relied on a hypothetical alternative injury—which illustrated the risk generally associated with the type of conduct and injury—to conclude that the actual injury created a substantial risk of death.
¶20 We held that the trial court erred when it allowed the jury to consider the expert's testimony. We reasoned that, although the seriousness of the defendant's conduct may shed light on the defendant's intent, it remains irrelevant to the issue of whether the injury involved substantial risk of death:
While such testimony as to the gravity of the risk created by the defendant's conduct may be relevant as circumstantial evidence of his intent to inflict serious bodily injury, such evidence is irrelevant to prove that the defendant's acts caused a substantial risk of death to the victim based on the actual injuries inflicted. Id. (emphases added) (footnote omitted). Therefore, we dismissed reliance on the risk generally associated with the type of conduct or injury in determining whether an injury involves substantial risk of death.
¶21 The court of appeals subsequently interpreted Stroup in Sanchez and Covington, two decisions upon which the trial court here relied. We now review those decisions.
C. Sanchez and Covington
¶22 In Sanchez, the defendant stabbed the victim in the abdomen and caused a liver laceration. 751 P.2d at 1014. To evaluate the laceration, physicians opened the victim's stomach cavity. Id. There, the physicians found no bleeding and determined that the laceration required no treatment. Id. Nevertheless, the trial court permitted one of the physicians to testify at trial that "62% to 95% of untreated liver lacerations result in death." Id.
¶23 The defendant argued, on appeal, that the trial court erred in allowing the jury to consider the charge of first-degree assault because the victim's injury did not involve substantial risk of death. Id. at 1013-14. A division of the court of appeals disagreed, reasoning that the physician's testimony "was sufficient to allow the issue of whether there was a substantial risk of death to the victim to be submitted to the jury." Id. at 1014 (citing Stroup, 656 P.2d 680 ). In addition, the division noted that, because the jury also received instructions on second- and third-degree assault, its decision to convict the defendant of first-degree assault indicated agreement that the injury involved substantial risk of death. Id.
¶24 Judge Tursi dissented, asserting that the majority disregarded Stroup's emphasis "on the injury the victim actually suffered." Id. (Tursi, J., concurring in part and dissenting in part) (quoting Stroup, 656 P.2d at 685 ). Judge Tursi noted that, "although the evidence [in Sanchez ] disclosed that generic liver lacerations generally involve a substantial risk of death, the specific injury actually suffered by the victim ... did not involve any such risk." Id. (emphases added).
¶25 In Covington, the defendant came home drunk, loaded his rifle, and fired a shot through a wall. 988 P.2d at 659. The bullet "struck his wife, penetrating and exiting both of her upper thighs without hitting any bones, nerves, or arteries." Id. At trial, a non-treating emergency room physician used photographs of the wife's injuries to testify about "the concerns that the observable injury would present to a treating physician," especially potential injuries to bones, nerves, or arteries. Id. In the process, the physician expressed the opinion that such an injury could —without saying that the actual injury did —involve substantial risk of death: "In my mind when I see an injury like that, to me that is a potentially life-threatening injury." Id. at 662 (emphasis added).
¶26 The defendant argued, on appeal, that the injury did not involve substantial risk of death because the bullet did not damage any bones, arteries, or nerves, and that, therefore, the trial court allowed the jury to consider irrelevant evidence, namely the physician's testimony. Id. at 661-62. A division of the court of appeals disagreed: "The fact that none of those structures or vessels were actually involved, whether fortuitously or not, does not diminish the fact that the wound actually inflicted involved a substantial risk of death." Id. at 663.
¶27 The defendant argued, furthermore, that the trial court erred when it refused to deliver an instruction explaining that "the focus has to be on the damage actually caused by the bullet, not on what damage might have occurred under different circumstances." Id. The division again disagreed, focusing on "injury" and rejecting the defendant's use of "damage" in assessing substantial risk of death: "While we agree that the focus of the inquiry is on the injury and not the risk posed by defendant's conduct, see Stroup ..., the definition of serious bodily injury speaks in terms of injury, not damage." Id. Accordingly, the division deemed the proposed instruction "not a correct statement of the law" and the trial court's refusal to deliver it appropriate.4 Id.
¶28 After the court of appeals decided Sanchez but before the court decided Covington, the General Assembly amended the definition of serious bodily injury. We now review that amendment.
D. The General Assembly's Amendment of the Serious Bodily Injury Definition
¶29 After Stroup, the General Assembly amended the definition of serious bodily injury to add a clarifying interjection, leaving the original phrasing otherwise unchanged. When this court decided Stroup, "[s]erious bodily injury" meant "bodily injury which involves a substantial risk of death." 656 P.2d at 685 (quoting § 18-1-901(3)(p), C.R.S. (1973) ). After the amendment, "[s]erious bodily injury" means "bodily injury which, either at the time of the actual injury or at a later time, involves a substantial risk of death." § 18-1-901(3)(p), C.R.S. (2020) (emphasis added); H.B. 91-1086, 58th Gen. Assemb., 1st Sess. (Colo. 1991).
¶30 With this background in mind, we now consider whether the amendment undermines our decision in Stroup .
E. The Facts of the Actual Injury Control the Substantial Risk of Death Determination
¶31 According to the amended definition, "serious bodily injury" means "bodily injury which, either at the time of the actual injury or at a later time, involves a substantial risk of death." § 18-1-901(3)(p). The definition speaks of the facts of the actual injury: "bodily injury which ... involves a substantial risk of death." Id. (emphasis added). The definition does not speak of bodily injury which "could," "might," or "generally does" involve substantial risk of death; nor does the definition speak of a "category," "kind," or "type" of bodily injury which involves substantial risk of death. Therefore, nothing in the amendment undermines our holding in Stroup , where we concluded that the "plain language" of the definition "focuses on the injury the victim actually suffered." 656 P.2d at 685. That remains as true after the amendment as before.
¶32 Accordingly, the General Assembly's addition of the language "either at the time of the actual injury or at a later time" does not change the substantial risk of death determination. The facts of the actual injury still control that determination, not the risk generally associated with the type of conduct or injury in question. The additional language simply clarifies when the facts of the actual injury can involve substantial risk of death, namely at one time but not another. This occurs, for example, when the victim recovers as a result of medical treatment: An injury which involves substantial risk of death does not become any less of a serious bodily injury because the victim recovers.5 The additional language covers such eventualities.6 The nexus between the facts of the actual injury and substantial risk of death remains. ¶33 Thus, we reaffirm our decision in Stroup and hold that the facts of the actual injury control the substantial risk of death determination under section 18-1-901(3)(p), not the risk generally associated with the type of conduct or injury in question. We now consider whether Sanchez and Covington, the court of appeals' decisions interpreting Stroup upon which the trial court here relied, correctly interpret our decision in Stroup.
F. Sanchez and Covington Erroneously Interpret Our Decision in Stroup
¶34 The court of appeals division in Sanchez interpreted Stroup as basing the substantial risk of death determination on the risk generally associated with the type of injury in question—a liver laceration —as opposed to the facts of the actual injury. Although the victim's liver laceration did not bleed and required no treatment, the division approved the physician's testimony that generic liver lacerations generally involve substantial risk of death: "62% to 95% of untreated liver lacerations result in death." Sanchez, 751 P.2d at 1014. This was error. The facts of the actual injury control the serious bodily injury determination, not the risk generally associated with the type of conduct or injury in question.
¶35 The court of appeals division in Covington also interpreted Stroup as basing the substantial risk of death determination on the risk generally associated with the type of conduct and injury in question—a gunshot wound to the thighs—as opposed to the facts of the actual injury. Although the bullet did not damage any bones, arteries, or nerves, the division nevertheless approved the physician's testimony, which expressed the opinion that gunshot wounds to the thighs generally involve substantial risk of death as a result of damage to those vital structures. When the defendant correctly raised the possibility that the facts of the actual injury—no damage to any vital structures—might not involve substantial risk of death, the division explicitly disclaimed reliance on the facts of the actual injury. That the bullet did not damage any vital structures, the division explained, "does not diminish the fact that the wound actually inflicted involved a substantial risk of death." Covington, 988 P.2d at 663 (emphasis added). This, too, was error. The facts of the actual injury control the substantial risk of death determination, not the risk generally associated with the type of conduct or injury in question.
¶36 Thus, to the extent inconsistent with Stroup and this opinion, we overrule the court of appeals' decisions in Sanchez and Covington. We now apply the correct standard to the facts of this case.
G. The Stab Wound to the Neck Here Did Not Involve Substantial Risk of Death and Vigil Did Not Cause Serious Bodily Injury ¶37 A preliminary hearing "protects the accused" by ensuring that "the prosecution can at least sustain the burden of proving probable cause," specifically "probable cause to believe that a crime was committed and that the defendant committed it." Hunter v. Dist. Ct., 190 Colo. 48, 543 P.2d 1265, 1267 (Colo. 1975) ; see also People v. Rowell, 2019 CO 104, ¶ 12, 453 P.3d 1156, 1159. Whether the People sustained the burden of proving probable cause on the amended Count 2 here depends entirely on the legal question of whether Vigil caused serious bodily injury—i.e., whether Combs sustained "bodily injury which ... involves a substantial risk of death." § 18-1-901(3)(p). ¶38 We conclude that the testimony at the preliminary hearing failed to demonstrate that Combs sustained "bodily injury which ... involves a substantial risk of death" under section 18-1-901(3)(p). As Dr. Verzemnieks explained, a stab wound to the neck would involve substantial risk of death if the knife injured certain vital structures, among them the major blood vessels, lungs, esophagus, trachea, and spinal cord. Although Dr. Verzemnieks and the hospital's trauma team initially considered the possibility that Combs had sustained such an injury, the medical examination revealed no damage to the vital structures. With the focus, under Stroup, properly on the facts of the actual injury as opposed to the risk generally associated with the type of conduct or injury, the stab wound to the neck here did not involve substantial risk of death.
¶39 The People make several arguments to the contrary, none persuasive: First, the People assert that Dr. Verzemnieks testified that, "at the time of injury, Mr. Combs' penetrating neck wound created a substantial risk of death." Not so. In fact, Dr. Verzemnieks consistently maintained that the facts of the actual injury did not involve substantial risk of death, that the degree of risk did not increase or decrease over time, and that treatment did not affect the degree of risk. The testimony does suggest some confusion about the legal definition of "substantial risk of death," including that Dr. Verzemnieks came to believe that a particular injury involves substantial risk of death—in the legal sense—if he would have initially suspected substantial risk of death from the type of injury. Because Dr. Verzemnieks knew that a stab wound to the neck can involve substantial risk of death and, in Combs's case, could not rule out substantial risk of death until after the medical examination, he told Investigator Buoniconti that Combs's stab wound to the neck met the definition.
¶40 But the testimony makes clear that Dr. Verzemnieks only agreed that the injury involved substantial risk of death based on an initial assessment of the dangerousness of the type of injury, not the facts of the actual injury. At one point, for example, the prosecutor asked Dr. Verzemnieks—point blank—whether, at the time Combs sustained the stab wound to the neck, the injury involved substantial risk of death. To resolve confusion, Dr. Verzemnieks asked a clarifying question: "At the time of the injury[,] knowing nothing else?" (Emphasis added.) The prosecutor answered in the affirmative, and only then did Dr. Verzemnieks agree. In other words, Dr. Verzemnieks recognized that a stab wound to the neck can, and frequently does, involve substantial risk of death but that here, based on the facts of the actual injury, it did not. Accordingly, the record does not support the People's assertion that, at the time of the injury, the facts of the actual injury involved substantial risk of death.
¶41 Second, the People attempt to procedurally distinguish this case from Stroup, explaining that Stroup "did not involve a preliminary hearing or a probable cause determination." This makes no difference. The legal question remains the same.7 ¶42 Third, the People rely on the precedential value of the Sanchez and Covington decisions. As previously discussed, however, Sanchez and Covington erroneously interpret Stroup and, therefore, cannot provide such precedential support. See supra Part III.F.
¶43 Finally, the People argue that the General Assembly's amendment of section 18-1-901(3)(p) supports the Sanchez and Covington interpretations of the definition of serious bodily injury. As previously discussed, however, the amendment did not change the substance of the definition codified in the statute and interpreted in the Stroup decision. See supra Parts III.D-E.
¶44 Accordingly, because the knife missed all vital structures, the stab wound to the neck here did not involve substantial risk of death, and thus, Vigil did not cause serious bodily injury.
IV. Conclusion
¶45 We hold that the facts of the actual injury control the substantial risk of death determination under section 18-1-901(3)(p), not the risk generally associated with the type of conduct or injury in question. In so doing, we reaffirm our decision in Stroup, 656 P.2d 680, and to the extent inconsistent with Stroup and this opinion, overrule the court of appeals' decisions in Sanchez, 751 P.2d 1013, and Covington, 988 P.2d 657. Accordingly, because the knife missed all vital structures, the stab wound to the neck here did not involve substantial risk of death, and thus, Vigil did not cause serious bodily injury. Therefore, we make the rule to show cause absolute and remand for further proceedings consistent with this opinion.
1 At several points in this opinion, we use the phrase "conduct/actual injury distinction" as shorthand for the difference between these two ways of assessing substantial risk of death—on the one hand, the risk generally associated with the type of conduct or injury in question and, on the other hand, the facts of the actual injury.
2 In a single, offhand paragraph, the People "note that the record supports" one of the other ways a person commits first-degree assault—involving "intent to disfigure another person seriously and permanently." See § 18-3-202(1)(b). Without the benefit of a fully developed record or argument, we express no opinion on whether Vigil could have committed first-degree assault on this ground.
3 As discussed below, we determine that the General Assembly's amendment of the definition of serious bodily injury did not change the substance of the definition. See infra Parts III.D-E.
4 We ultimately granted certiorari and reversed the court of appeals on other grounds. Covington, 19 P.3d at 17-18. The parties did not petition regarding—nor did we consider or address—the meaning of the phrase "substantial risk of death" in the definition of serious bodily injury.
5 Here, we conclude that the stab wound to the neck did not involve substantial risk of death at any time. See infra Part III.G. But, hypothetically speaking, had the stab wound to the neck involved substantial risk of death at the time of the injury and had Combs later recovered, he would have still sustained serious bodily injury.
6 This case does not implicate the second part of the additional language—"or at a later time"—and, therefore, we express no opinion on its meaning.
7 In addition, the District Court, in its response to the order to show cause, attempts to factually distinguish this case from Stroup, explaining that "unlike in Stroup, the [trial] court [here] did not rely on the hypothetical risks posed by the defendant's alleged conduct." But we disapproved of the "hypothetical risks" testimony in Stroup because of the expert's use of the hypothetical alternative injury to illustrate the risk generally associated with the type of conduct and injury and, on that basis, to conclude that the actual injury created a substantial risk of death. See Stroup , 656 P.2d at 686. Here, although the People did not offer and the trial court could not, therefore, explicitly rely on a hypothetical alternative injury, the trial court nevertheless erroneously relied on the risk generally associated with the type of conduct and injury in question to conclude that the actual injury involved substantial risk of death.